# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANTHONY MONTGOMERY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>AMERICAN AIRLINES, INC. )<br>)<br>Defendant. ) | No. 07 C 5924 |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant American Airlines, Inc.'s ("American Airlines") motion for summary judgment. For the reasons stated below, we grant American Airlines' motion in its entirety.

## BACKGROUND

Plaintiff Anthony Montgomery ("Montgomery") alleges that he has been employed at American Airlines since December 1989. According to Montgomery, he initially worked for American Airlines as a Fleet Service Clerk and in October 2006, Montgomery obtained a transfer to American Airlines' Automotive Shop ("Auto Shop"), which was a significantly higher paying position that required

advanced skill and training.  Montgomery alleges that of the 73 mechanics working in the Auto Shop, Montgomery was one of only three African-Americans and that he was the only African-American employee who worked on the shop floor. Montgomery alleges that beginning with his transfer to the Auto Shop, his coworkers engaged in constant racial harassment and discrimination in an effort to remove him from the Auto Shop.  Montgomery claims that his coworkers referred to him using racial slurs, refused to work with him on collaborative assignments, made derogatory comments toward him, and carried out other acts meant to mock, harass, and belittle Montgomery.

Montgomery further alleges that American Airlines discriminated against him on the basis of his race by failing to provide him with the resources, opportunities, and training that were provided to other similarly situated employees.  When Montgomery began working in the Auto Shop, he was allegedly placed on a six month probationary period, after which he would be required to pass an examination in the Auto Shop ("Exam").  Montgomery alleges that unlike other probationary mechanics who were transferred among the Auto Shop's many departments to gain experience, American Airlines refused to train him in certain types of tasks. According to Montgomery, more experienced coworkers refused to provide Montgomery with any guidance on his assignments.  Montgomery alleges that he made several complaints to his supervisors about his disparate treatment, but these complaints were never redressed.

At the completion of the six month probationary period, Montgomery alleges that he was fully prepared to take the Exam despite his coworkers' and supervisors'

efforts to ensure that he would fail. According to Montgomery, the American Airlines employee conducting the test deliberately sought to make Montgomery fail by refusing to give him the quantifiable written portion of the Exam and subjecting Montgomery to exceedingly difficult questions and tasks on his oral and hands-on portions of the Exam. Montgomery claims that he successfully completed every portion of the Exam and that each time he correctly answered a question the employee administering the test exhibited anger. Montgomery alleges that the supervisor asked Montgomery to identify the part number for a mechanical part that Montgomery claims does not exist. Montgomery claims that after he failed to identify the one part, the supervisor informed him that he failed the Exam, despite having missed only one question. Montgomery alleges that other mechanics, who are not African-Americans, passed the same Exam despite missing substantially more than one question. Montgomery claims that other mechanics who were not African-Americans were able to progress out of the probationary period without even completing the Exam.

Montgomery alleges that after the Exam he was demoted from the Auto Shop to his former position as a Fleet Service Clerk. Subsequent to his demotion, Montgomery allegedly complained to the Human Resources Representative at American Airlines who Montgomery alleges covered up the incidents rather than investigating them.

Montgomery brought the instant action and includes in the complaint a claim alleging racial harassment and hostile work environment in violation of 42 U.S.C. § 1981 ("Section 1981") (Count I), a claim alleging racial harassment and hostile work

environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e *et seq.* (Count II), a claim alleging race discrimination in

violation of Section 1981 (Count III), and a claim alleging race discrimination in

violation of Title VII (Count IV).  American Airlines now moves for summary

judgment on all claims.


## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most

favorable to the non-moving party, reveals that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(c).  In seeking a grant of summary judgment, the moving party must

identify "those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate

the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied

by presenting specific evidence on a particular issue or by pointing out "an absence

of evidence to support the non-moving party's case."  *Id.* at 325.  Once the movant

has met this burden, the non-moving party cannot simply rest on the allegations in

the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set

forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e).  A "genuine issue" in the context of a motion for summary judgment is not

simply a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of

material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

As an initial matter, we note that hostile work environment and race discrimination claims brought under Section 1981 are evaluated "under the same rubric as Title VII claims" and thus do not need to be addressed separately. *Herron v. Daimler Chrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006)(stating that "'[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical'")(quoting *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996)). Therefore, we will consider Montgomery's Section 1981 and Title VII hostile work environment claims (Counts I and II) under the same analysis and we will consider Montgomery's Section 1981 and Title VII race discrimination claims (Counts III and IV) under the same analysis.

I. Hostile Work Environment Claims (Counts I and II)

American Airlines moves for summary judgment on Montgomery's hostile work environment claims, arguing that based on the evidence in the record, there is no genuine issue of material fact and that American Airlines is entitled to judgment as a matter of law.  The Seventh Circuit has set forth four factors that a plaintiff must show in order to succeed on a hostile work environment claim: "'(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability.'" *Herron*, 388 F.3d at 302 (quoting *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004)).

Montgomery has stated in his deposition that he was subjected to harassment by his fellow employees throughout the time that he worked in the Auto Shop.  (SAF Par. 100, 104, 106-07).  American Airlines disputes many of the facts submitted by Montgomery regarding his allegations of harassment, arguing that the only evidence submitted by Montgomery to support such facts consists of his own self-serving deposition testimony.  We note, however, that the Seventh Circuit has found that a party's own self-serving deposition can create a genuine issue of material fact in order to defeat summary judgment.  *See Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006)(stating that "[w]e have long held that a plaintiff may defeat summary judgment with his or her own deposition"); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).  It is not appropriate for this court at the

summary judgment stage to make "'credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Paz*, 464 F.3d at 664 (quoting *Payne*, 337 F.3d at 770).  Thus, Montgomery's deposition testimony is sufficient to raise issues of fact and, at the summary judgment stage, this court must consider the record as a whole in a light most favorable to Montgomery and draw all reasonable inferences in favor of Montgomery.  *Anderson*, 477 U.S. at 255.  Nevertheless, American Airlines argues that even if the court accepted Montgomery's allegations as true, American Airlines would still be entitled to summary judgment since: (1) Montgomery failed to properly report the majority of the alleged harassment to his superiors, (2) the alleged harassment was not severe or pervasive enough to create a hostile working environment, and (3) the alleged harassment was not based on Montgomery's race.


A. Evidence of Harassment

Montgomery states that throughout his time working in the Auto Shop he was subjected to "hate-related language and derogatory statements about being an African-American."  (SAF Par. 100).  Montgomery has submitted evidence, largely in the form of his own deposition testimony, detailing incidents of racial harassment. Specifically, Montgomery testified in his deposition that on one occasion, while he was clocking out from work he heard one of the other employees refer to him using a racial slur.  (SAF Par. 100).  Although Montgomery testified that this was the only time in which he was aware that such a racial slur was directed at him, he also testified that his coworkers often used racial slurs in his presence, particularly in the

employee locker room.  (Montgomery Dep. 504-05).  Montgomery testified that other employees also used the word "they" in a derogatory fashion, referring to Montgomery's race, and criticized his skills because of his race.  (Montgomery Dep. 504-05).  Montgomery also testified that one of his coworkers remarked to Montgomery that "he could not see [Montgomery] until [Montgomery] smiled." (SAF Par. 102).  Montgomery testified that other employees refused to ride in trucks with him or assist him with his work because of his race.  (SAF Par. 104). According to Montgomery, in March 2007, someone who worked in the Auto Shop smashed a dark, rotten banana on Montgomery's toolbox.  (SAF Par. 107). Montgomery also testified that one of the crew chiefs in the Auto Shop, Frank Dlugopolski ("Dlugopolski"), made racial remarks around Montgomery, including the statement that "all blacks are alike because they are from the ghetto or hood." (SAF Par. 104).  Also, according to Montgomery, Dlugopolski stated in response to a complaint by Montgomery about his treatment, that "brothers are always complaining."  (SAF Par. 104).  Finally, Montgomery testified that his fellow employees sprayed chemicals on his food and placed a 30 to 40 pound rotor on his toolbox which dripped oil into his tools.  (SAF Par. 106-107).

## B. Issues of Fact Relating to Harassment Based on Race

The first two prongs of the hostile work environment standard require a plaintiff to show that he was subject to unwelcome harassment and that harassment was based on race.  *Herron*, 388 F.3d at 302.  American Airlines argues that Montgomery's evidence of racial harassment consists only of his self-serving

deposition testimony and American Airlines has presented its own evidence from other employees contradicting Montgomery's statements, including the testimony of an American Airlines Human Resources representative who conducted an investigation into Montgomery's allegations and determined that no such harassment occurred.  (RSAF Par. 107).  However, as stated above, self-serving testimony is sufficient to create a genuine issue of material fact.  *Paz*, 464 F.3d at 664.  Taking the evidence presented in a light most favorable to Montgomery, an issue of fact does remain as to whether Montgomery was subject to unwelcome harassment and whether that harassment was based on his race.

### C. Hostile Work Environment

The third prong of the hostile work environment standard requires the plaintiff to show that "'the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being.'"  *Herron*, 388 F.3d at 302 (quoting *Hrobowski*, 358 F.3d at 476).  According to the Seventh Circuit, a hostile work environment must be "'so severe or pervasive as to alter the conditions of employment and create an abusive working environment.'"  *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)(quoting *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002)).  The environment must be "both subjectively and objectively offensive."  *Herron*, 388 F.3d at 302.  The court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive

utterance, and whether it unreasonably interferes with an employee's work performance." *Id.* at 303.

The evidence presented by Montgomery is sufficient to create an issue of material fact with respect to a hostile work environment. Based on Montgomery's statements, a reasonable factfinder could conclude that Montgomery's work environment was objectively hostile. Furthermore, Montgomery has provided testimonial evidence that he found his working conditions to be subjectively hostile. For example, Montgomery alleges that due to the harassment, he was forced to isolate himself, skip regularly scheduled breaks, wait in the locker room until everyone clocked out after work, and avoid putting his lunch in the refrigerator out of fear that chemicals would be sprayed on it. (SAF Par. 105-06). Thus, material issues of fact remain as to whether the alleged harassment of Montgomery was severe or pervasive enough to create a hostile work environment.

D. Employer Liability

American Airlines argues that even if Montgomery has raised genuine issues of fact on the subject of whether he was exposed to racial harassment, Montgomery has not established a basis for employer liability since Montgomery has only alleged that he was harassed by his coworkers and Montgomery failed to properly notify his supervisors of any harassment. Montgomery argues that he was subjected to harassment by his fellow employees and a crew chief and that he did make efforts to bring the harassment to the attention of his supervisors. However, at this stage in the litigation Montgomery must support this contention with evidence and "set forth

specific facts showing that there is a genuine issue for trial" as to whether there was employer liability. Fed. R. Civ. P. 56(e); *see also Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)(describing summary judgment as the "put up or shut up" moment in the lawsuit).

To determine employer liability under the fourth factor, the Seventh Circuit has held that "if the harasser is a supervisor, the employer is strictly liable for the harassment, while if he is a coworker the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers." *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006). An employer is liable if it fails "'to take appropriate remedial measures once apprised of the harassment.'" *Rhodes*, 359 F.3d at 506 (quoting *Hostetler v. Quality Dining, Inc.*, 218 F.3d 789, 809 (7th Cir. 2000)). An employee must "'make[] a concerted effort to inform the employer that a problem exists.'" *Id.* (quoting *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999)). An employer can be charged "with constructive notice where the harassment is sufficiently obvious." *Id.* at 507.

### 1. Supervisor Harassment Standard

The first issue to be determined when addressing the basis for employer liability is whether Montgomery was subjected to harassment by his supervisor. Montgomery's testimonial evidence suggests that he was subjected to demeaning remarks, made by Dlugopolski, who the parties agree acted as a "crew chief" in the Auto Shop. (SAF Par. 98). In distinguishing a supervisor versus a coworker for

purposes of strict liability, the Seventh Circuit has indicated that the "paradigmatic supervisor . . . has the authority to fire the plaintiff" whereas the "paradigmatic coworker is a worker of the same status as the plaintiff." *Oberweis Dairy*, 456 F.3d at 716-17. Further, a worker "merely having authority to oversee aspects of another employee's job performance" is not a "supervisor." *Rhodes*, 359 F.3d at 506. The evidence in the record clearly indicates that Dlugopolski was not Montgomery's supervisor. Montgomery has pointed to no evidence that would indicate that Dlugopolski ever had the authority to fire Montgomery and the record reflects that Dlugopolski merely oversaw aspects of Montgomery's job performance. Montgomery admits that crew chiefs are members of the union, not management. (Montgomery Dep. 419). We also note that, in responding to American Airlines' statements of fact, Montgomery refers to his crew chiefs and his "supervisors" as separate employees. (RSF Par 51). It is thus clear from the record that crew chiefs such as Dlugopolski were not Montgomery's supervisors. The record indicates that the supervisors in the Auto Shop were Dave Brooks ("Brooks") and Clifton Shay ("Shay"), who were not union members but rather members of management. (Shay Dep. 9); (Brooks Dep. 15). The record also indicates that manager Brian Schaefer ("Schaefer"), would qualify as Montgomery's supervisor since Schaefer was also responsible for decisions regarding Montgomery's employment. (RSF Par. 16); (Ans. Ex. I).

Montgomery has not offered evidence that he was harassed on the basis of his race by any of his actual supervisors in the Auto Shop or at another department at American Airlines. None of Montgomery's allegations of racial harassment directly

involve Brooks, Shay, or Schaefer.  Montgomery did testify that he had trouble communicating with Brooks, Shay, and Schaefer and argues that he felt as if they ignored his concerns, but does not allege that they engaged in any of the racial harassment that forms the basis for his hostile work environment claim.  Even when considering the evidence in a light most favorable to Montgomery, the record does not reflect that Montgomery was harassed by his supervisors at American Airlines.

### 2. Coworker Harassment Standard

Since Montgomery has not presented evidence that he was subject to racial harassment by his supervisors, Montgomery must proceed under the standard for coworker harassment in order to show a material issue of fact with respect to American Airlines' liability.  As stated above, under the standard for coworker harassment, American Airlines can only be held liable for failing to enforce a reasonable policy for preventing harassment.  *Oberweis Dairy*, 456 F.3d at 716. Under this standard, Montgomery must also show that he took reasonable steps to inform American Airlines that he was being discriminated against on the basis of his race.  *Rhodes*, 359 F.3d at 506.  Montgomery argues that his deposition testimony regarding his efforts to inform American Airlines of his harassment are sufficient to raise an issue as to whether Montgomery took reasonable steps and whether American Airlines was reasonably apprised of the harassment.  Montgomery argues that he has provided sufficient evidence to indicate that he notified both his crew chiefs and his supervisors of the alleged harassment he was facing.

<u>a. Complaints to Crew Chiefs</u>

Montgomery states that his first complaints of racial harassment were made to his crew chiefs, including Dlugopolski. As stated above, the record reflects that the crew chiefs in the Auto Shop were not Montgomery's supervisors, but rather they were Montgomery's coworkers who oversaw certain aspects of his work. American Airlines has put forth undisputed evidence that at the time that Montgomery was employed at American Airlines, it had a policy that prohibited, among other things, racial harassment. (SF Par. 5). The official American Airlines policy against racial harassment provided that employees should report harassment to a supervisor, manager, or call a special hotline. (SF Par. 5). Montgomery does not dispute the fact that such a written policy was in place but argues that the actual policy in practice at American Airlines and in the Auto Shop was that mechanics should inform crew chiefs of any harassment. (RSF Par. 5). In support of his position that the policy in practice at American Airlines was that mechanics should contact their crew chief in the event that they encountered racial harassment, Montgomery relies on a statement that Shay testified he made to Montgomery in a meeting that "if [Montgomery] had a problem, that he needed to contact his crew chief[] [a]nd if that didn't work, contact his immediate supervisor[] [a]nd if he didn't get satisfaction there, to come to [Shay] personally and [Shay] would make sure that things got taken care of for him." (Shay Dep. 45, Ex. D P SAF). However, this statement by Shay does not support Montgomery's contention that the actual practice at American Airlines was that employees should only contact their crew chief to report harassment. The evidence relied upon by Montgomery clearly demonstrates that

Shay notified Montgomery of American Airlines' policy that employees should contact their supervisor at American Airlines if complaints to a crew chief did not work. (Shay Dep. 45); (SAF Ex. D). Such a statement is in line with American Airlines' written policy on harassment and nothing in that statement indicates that there was a separate policy in practice at American Airlines that contradicted its written policy. The undisputed facts, therefore, establish that complaints made only to a crew chief would not conform to American Airlines' policy governing the reporting of racial harassment.

    b. Complaints to Supervisors Shay and Brooks

    Montgomery also argues that he made complaints to supervisors Shay and Brooks. Specifically, Montgomery states that he had several meetings in February 2007 with Shay and Brooks in which he complained about racial harassment and these complaints were ignored. (SAF Par. 113). However, at this stage in the litigation, Montgomery is required to support his contentions by pointing to evidence in the record. *Johnson*, 325 F.3d at 901. The evidence that Montgomery relies upon does not support his argument that he brought his concerns of racial harassment to the attention of his supervisors.

    In support of his contention that he brought his concerns of racial harassment to Shay and Brooks, Montgomery points to passages from his own deposition testimony in which Montgomery testified about his efforts to inform management at American Airlines of the harassment he was allegedly encountering. This testimony does not, however, support Montgomery's contention that he brought his allegations

of racial harassment to either Shay's or Brooks' attention.  According to Montgomery, Shay and Brooks held a meeting with Montgomery where Montgomery claims that he attempted to tell Shay and Brooks of the harassment he was allegedly encountering.  (Mont. Dep. 156-57).  Montgomery testified that he began the meeting by raising concerns about the fact that he would be required to take the Exam and that Shay (who is also African-American) cut Montgomery off and questioned him in regards to a complaint that Montgomery had raised with human resources about another employee.  (Mont. Dep. 156-57, 159-60).  Montgomery claims that he intended to describe to Shay and Brooks the extent of the harassment against him when the meeting was interrupted by another employee.  (Mont. Dep. 156-57).  At one point in his deposition, Montgomery did state that he referenced harassment in the Auto Shop during this meeting with Shay and Brooks, but Montgomery did not testify that he provided any details of that harassment or that the harassment was racial in nature.  (Mont. Dep. 159, 162-63).  Montgomery testified that Brooks and Shay did not follow up with Montgomery after the meeting was cut short, but Montgomery also states that he did make efforts to follow up with Shay and Brooks.  (Mont. Dep. 160).  Montgomery did specifically acknowledge in his deposition that he did not report many of his specific allegations of harassment to his supervisors, including his allegations that coworkers used racial slurs in his presence,  that coworkers placed a banana in his toolbox, and that coworkers repeatedly sprayed oil on his lunch.  (Mont. Dep. 415-25).  Thus, Montgomery has not presented sufficient evidence whereby a reasonable trier of fact could conclude that Montgomery followed American Airlines' racial harassment policy by notifying

Shay and Brooks of the harassment he was allegedly enduring.


     c. Complaints to Manager Schaefer

Montgomery also argues that he successfully notified Schaefer of his allegations of racial harassment. Specifically, Montgomery argues that he complained about racial harassment in a meeting with Schaefer, his manager, in late February or early March 2007 and these complaints were "brushed [] off." (SAF Par. 114). However, once again, the testimony cited by Montgomery does not support his proposition that he notified Schaefer of his allegations of racial harassment. According to Montgomery, Schaefer held a meeting with him in March 2007, during which Montgomery primarily raised concerns about the fact that he was required to take the Exam. (Mont. Dep. 148). Montgomery testified that during the meeting, which lasted 15 to 20 minutes, Montgomery told Schaefer the "[t]he guys [were] not treating [Montgomery] right." (Mont. Dep. 147). Montgomery testified "I said [to Schaefer] 'why are they letting all these white guys in without giving them a test; and with me they wanna give me a test . . . that's harassment and discrimination. . . .'" (Mont. Dep. 148). According to Montgomery's testimony, Schaefer explained in response to Montgomery's concerns that prior to Schaefer's arrival, there was no teacher to administer the test but that Schaefer had plans to begin implementing the test again. (Mont. Dep. 148). Montgomery also testified that he raised other miscellaneous concerns with Schaefer including the fact that Shay and Brooks refused to acknowledge him, that there were times that Shay was supposed to be on the clock but was not, that Montgomery had not been given a

definitive date for his probationary examination, and that Dlugopolski had used the word "ghetto." (Mont. Dep. 147-51, 414). Montgomery has not, however, pointed to testimony or other evidence that would indicate that he notified Schaefer of even a fraction of his present allegations of racial harassment. Montgomery acknowledges that at the end of the meeting, when Schaefer asked him if there was anything else Montgomery needed to tell him, that Montgomery said, "[w]ell . . . forget it . . . that's all right." (Mont. Dep. 148). Furthermore, Montgomery does not dispute the fact that Schaefer did take action with respect to some of his complaints. For example, American Airlines has put forth evidence that, as a direct result of Montgomery's complaints to Schaefer about Brooks' unavailability, Schaefer conducted an investigation which resulted in Brooks' voluntary resignation. (SF Par. 22). Montgomery does not dispute the fact that Brooks left American Airlines after Schaefer investigated Montgomery's complaints and argues that Brooks did not voluntarily resign but rather was terminated. (RSF Par. 22).

Montgomery argues that his deposition testimony raises a material issue of fact with respect to the issue of whether Montgomery brought the harassment he was allegedly facing to the attention of his supervisors and manager and that he followed American Airlines' written policy as well as their policy in practice for reporting race discrimination. While self-serving deposition testimony can be used to raise a material issue of fact, Montgomery's deposition testimony fails to support his contention that he properly notified American Airlines of a hostile work environment. Montgomery's testimony establishes that he repeatedly raised his concerns about the propriety of the implementation and administration of his Exam

to his supervisors Shay, Brooks, and Schaefer. At most, the evidence submitted by Montgomery shows that he also raised vague issues about other employees not "treating [him] right," with Shay, Brooks, and Schaefer. (Mont. Dep. 147). However, a reasonable factfinder could not conclude, based on the evidence in the record, that Montgomery notified his supervisors that he was being subjected to harassment on the basis of his race. Montgomery admits in his deposition that a large number of the allegations he has raised of extreme racial animus and hostile actions by his coworkers were not actually brought to the attention of his supervisors. (Mont. Dep. 415-25). Montgomery has not properly disputed the fact that American Airlines employed a comprehensive written policy which offered employees the opportunity to report racial harassment to supervisors and managers and even provided a hotline that could be used to report harassment. (SF Par. 5); (RSF Par. 5). Montgomery has not shown that any of these options were unavailable to him or that American Airlines, in fact, employed a different policy in practice.

### d. Complaints to Human Resources

Both parties agree that Montgomery did bring up some of his allegations of racial harassment with human resources officer Jackie Rios ("Rios"). The parties do not dispute the fact that Rios learned about Montgomery's complaints in August 2007, several months after Montgomery had been demoted from the Auto Shop. (SF Par. 48); (RSF Par. 48). American Airlines has put forth evidence, which Montgomery has not properly disputed, that Rios initiated a meeting with Montgomery on August 10, 2007, in which Rios solicited Montgomery's complaints

about his experiences in the Auto Shop. (SF Par. 49-50); (RSF Par. 49-50). Montgomery argues that Rios failed to ask him the appropriate questions and that Rios was disinterested in his complaints, but Montgomery has not properly disputed the fact that Rios immediately commenced an investigation into Montgomery's complaints after the meeting. (SF Par. 53-56); (RSF Par. 53-56). Specifically, the undisputed facts show that Rios met with Montgomery on at least three occasions to discuss his complaints and Rios conducted interviews with numerous employees from the Auto Shop including other mechanics, crew chiefs, and supervisors. (SF Par. 53-56); (RSF Par. 53-56). Montgomery has not put forth any allegations that he was subjected to racial harassment at American Airlines at any time following Rios' investigation. Liability cannot be imputed on an employer that takes prompt action to investigate a complaint of harassment and make efforts to prevent further misconduct. *See Tutman v. WBBM-TV/CBS Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)(stating that an "employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring"). Based on the evidence that has been submitted by the parties, no reasonable trier of fact could conclude other than that the first time that Montgomery properly notified American Airlines of his allegations of racial harassment was in the meeting with Rios on August 10, 2007, and that American Airlines, through Rios, took prompt corrective action in investigating the allegations by Montgomery. *See Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1029-30 (7th Cir. 2004)(finding that liability could not be imputed on an employer when the supervisor immediately investigated complaints of racial harassment and

delivered verbal warnings to other employees). Based on the evidence in the record, no reasonable trier of fact could conclude that American Airlines failed "to take appropriate remedial measures once apprised of the harassment." *Rhodes*, 359 F.3d at 506 (quoting *Hostetler*, 218 F.3d at 809). Thus, we find as a matter of law that liability cannot be imputed on American Airlines and American Airlines is entitled to summary judgment on Montgomery's hostile work environment claims.

## II. Race Discrimination Claims (Counts III and IV)

American Airlines also moves for summary judgment on Montgomery's race discrimination claims. Montgomery argues that American Airlines discriminated against him on the basis of his race when American Airlines demoted him after the Exam. A plaintiff bringing a discrimination claim under Title VII may defeat a defendant's motion for summary judgment by using the direct method of proof or the indirect method of proof. *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). Under the direct method of proof, a plaintiff can only defeat a motion for summary judgment by presenting sufficient direct evidence or sufficient circumstantial evidence to establish a "'convincing mosaic' . . . that could permit a reasonable jury to conclude that the employer acted with discriminatory intent. . . ." *Id.*

Under the indirect method of proof, a plaintiff must first establish a *prima facie* case by showing that: "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations at the time of the alleged adverse action; (3) he was subjected to an adverse employment action; and (4) the employer

treated similarly situated employees not in the protected class more favorably."
*Scaife v. Cook County*, 446 F.3d 735, 739-40 (7th Cir. 2006).  Once a plaintiff has
established a *prima facie* case of discrimination, the burden shifts to the defendant to
provide a legitimate non-discriminatory reason for the adverse action.  *Id.* at 739.  If
such a reason is provided, the burden shifts back to the plaintiff to show that the
given reason is a pretext for unlawful discrimination.  *Id.* at 739-40.


A.  Direct Method of Proof

In his opposition to American Airlines' motion for summary judgment,
Montgomery argues that he can defeat summary judgment using the direct method of
proof.  (Ans. 9).  Under the direct method of proof, a plaintiff must establish a
discriminatory motivation through direct or circumstantial evidence.  *Rudin v.
Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).  Direct evidence is not
required to proceed under the direct method of proof, but the evidence presented,
whether direct or circumstantial, must be sufficient to create "'a triable issue of
whether the adverse employment action of which [the plaintiff] complains had a
discriminatory motivation.'"  *Id.* at 721 (quoting *Wallace v. SMC Pneumatics, Inc.*,
103 F.3d 1394, 1397 (7th Cir.1997)).

Montgomery argues that he has presented enough circumstantial evidence to
establish a "convincing mosaic" and that, based on this evidence, a reasonable jury
could conclude that American Airlines acted with discriminatory intent.  *Brewer*, 479
F.3d at 915.  Montgomery argues that there is evidence that American Airlines
disregarded "its numerous policies and procedures while administering the test to

Montgomery." (Ans. 8). Montgomery further argues that the evidence shows that the Exam was administered by an employee who harbored an overt discriminatory animus towards Montgomery. Finally, Montgomery argues that there is evidence that his performance on the Exam was "tainted" by his supervisors and coworkers who had displayed racial hostility towards Montgomery. (Ans. 8). The evidence presented by Montgomery does not rise to the level of a "convincing mosaic" of direct and circumstantial evidence that is required under the direct method standard. *Brewer*, 479 F.3d at 915. While Montgomery has offered his testimony to support his assertion that certain coworkers harassed him on the basis of his race, Montgomery has not offered evidence to establish a link between any racial animus by his coworkers and the administration of his Exam. *See Rozsowiak v. Village of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005)(stating that "remarks are actionable only if they injure the plaintiff; 'there must be a real link between the bigotry and an adverse employment action'")(quoting in part *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). While Montgomery has offered testimony that he perceived that the Exam was not administered fairly, Montgomery has not offered evidence that would create any inference that there was discrimination in the administration of the Exam on the basis of Montgomery's race. Furthermore, as explained below, Montgomery has not pointed to sufficient evidence that similarly situated employees were not required to take the Exam. Thus, in order to survive summary judgment on his race discrimination claims, Montgomery must proceed using the indirect method of proof.

B. Indirect Method of Proof

Montgomery also contends that he can prevail under the indirect method of proof for each of his claims. Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination. *Scaife*, 446 F.3d at 739. If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to present a legitimate non-discriminatory reason for the action. *Id.* If the employer presents such a reason, the plaintiff must show that the given reason is a pretext. *Id.* at 739-40.

1. *Prima Facie* Case of Discrimination

Montgomery contends that he can establish a *prima facie* case of unlawful discrimination. The parties do not dispute the fact that Montgomery is a member of a protected class. American Airlines has also not disputed the fact that Montgomery was subject to an adverse employment action when he was demoted after the Exam. Thus, for the purposes of summary judgment, the parties do not contest the first or third elements of the *prima facie* standard for establishing discrimination on summary judgment. The remaining issues, therefore, are whether Montgomery was meeting American Airlines' legitimate performance expectations at the time he was working at the Auto Shop and the time that he was transferred back to being a fleet service clerk and whether American Airlines treated similarly situated white employees more favorably.

American Airlines argues that, as a probationary employee, Montgomery was required to pass the Exam as well as a tool inspection in order to continue in the Auto

Shop and Montgomery's failure to pass both the Exam and the tool inspection is evidence that Montgomery was not meeting American Airlines' legitimate employment expectations. American Airlines has properly argued that it is responsible for setting reasonable standards to ensure the safety of its employees and customers. In this case, American Airlines argues that Montgomery failed to meet those standards and it is for that reason alone that Montgomery was unable to proceed out of his probationary period and was demoted from the Auto Shop.

Montgomery does not argue that American Airlines' requirement that employees pass an examination to proceed outside of their probationary period was invalid and discriminatory by itself. Rather, Montgomery argues that American Airlines applied this employment expectation in a disparate fashion, first by requiring Montgomery to take the Exam while others were not required to do so, and second, by administering the Exam in an unfair fashion. The Seventh Circuit has stated that "'[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner . . . the second and fourth prongs merge-allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry.'" *Elkhabit v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007)(quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)). Montgomery argues that he has presented such evidence and, thus, he has satisfied his *prima facie* burden. The issue with respect to the disputed prongs of Montgomery's *prima facie* burden is, therefore, whether Montgomery has put forth sufficient evidence to raise a material issue of fact as to whether American Airlines utilized the Exam in a disparate manner toward

Montgomery.


a. The Exam Requirement

Montgomery argues that American Airlines applied its legitimate employment expectations in a disparate fashion simply by requiring Montgomery to take the Exam while other similarly situated white employees were not required to do so.  In support of this argument, Montgomery points to three employees, Bill Romano ("Romano"), Dave Hilt ("Hilt"), and Tim Nguyen ("Nguyen"), who Montgomery argues were able to proceed out of their probationary period without taking the Exam.  (SAF Par. 80-82).   In order to satisfy the similarly-situated element of the *prima facie* case, a plaintiff "must demonstrate that there is someone directly comparable in all material respects."  *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559-60 (7th Cir. 2007)(stating that "[t]he 'similarly situated' test is a flexible, commonsense inquiry whose requirements vary from case to case" and that "[i]ts purpose is to determine whether there are enough common factors between a plaintiff and a comparator-and few enough confounding ones-to allow for a meaningful comparison in order to divine whether discrimination was at play").

Montgomery first argues that Hilt was a probationary mechanic whose probationary period, like Montgomery's, concluded during the time that Schaefer was the manager overseeing the Auto Shop.  (SAF Par. 82-84).  Montgomery asserts that Hilt did not take the Exam.  However, as stated above, Montgomery must support his contentions with evidence and "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To support his assertion that Hilt

did not take the Exam, Montgomery relies on his own deposition testimony in which Montgomery stated his belief that Hilt did not take the Exam. (Mont. Dep. 301). However, Montgomery did not provide any basis for his belief. (Mont. Dep. 301). We recognize that self-serving testimony by a plaintiff can at times create genuine disputes as to material facts, if, for example, such testimony relates to what the plaintiff saw or heard or based upon the plaintiff's personal knowledge. *Paz*, 464 F.3d at 664-65. However, self-serving beliefs by a plaintiff cannot create genuine disputes where the beliefs are not premised on a personal knowledge or any legitimate basis. *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007)(stating that "[i]t is unfathomable that a company claiming to have engaged in thousands of dollars of sales of a product for more than a decade would be unable to produce even a single purchase order or invoice as proof" and that "[s]elf-serving deposition testimony is not enough to defeat a motion for summary judgment"); *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)(stating that "[a]lthough a nonmoving party's own deposition may constitute affirmative evidence to defeat summary judgment, conclusory statements in the deposition do not create an issue of fact"); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003)(indicating that self-serving statements must be based on personal knowledge and "although personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience' and '[t]hey must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience'")(quoting in part *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991)). Montgomery has not presented evidence outside of his own speculation

to support his contention that Hilt did not take the Exam. Therefore, Montgomery has not offered sufficient evidence to support his contention that Hilt was a similarly situated employee who was treated differently than Montgomery.

With respect to Montgomery's identification of Nguyen as a similarly situated employee, American Airlines does admit that Nguyen did not take the Exam at the completion of his probationary period. (SF Par. 68). However, American Airlines argues that Nguyen is not a similarly situated employee to Montgomery since Nguyen's probationary period concluded when there was no manager overseeing the Auto Shop. Since employees must be "directly comparable in all material respects" an employee whose probationary period expired under a different time would not be similarly situated. *Barricks*, 481 F.3d at 559-60; *Salas v. Wisconsin Dept. Of Corrections*, 493 F.3d 913, 923 (7th Cir. 2007)(stating that "[f]actors to consider include whether the employee[] . . . [was] subject to the same supervisor"). American Airlines has offered evidence that when Schaefer became manager of the Auto Shop, he implemented a policy that probationary employees should once again be required to take the Exam. (SF Par. 18). The evidence submitted by American Airlines indicates that prior to Schaefer's installation as a manager, the Exam requirement had not been enforced due the fact that the manager position had been vacant. (SF Par. 17-18). In disputing American Airlines' evidence with respect to Schaefer's resolve Montgomery has merely pointed to evidence that it was not technically Schaefer's responsibility to ensure probationary employees took the Exam. (RSF Par. 18). However, Montgomery has not directly disputed American Airlines' evidence that Schaefer did, in fact, take it upon himself to institute such a

policy. (RSF Par. 18); *see Martino v. MCI Communications Servs., Inc.*, 2008 WL

2157170, at *1 (N.D. Ill. 2008)(stating that a "Court may disregard statements and

responses that do not properly cite to the record"); *Dent v. Bestfoods*, 2003 WL

22025008, at *1 n.1 (N.D. Ill. 2003)(indicating that a denial is improper if the denial

is not accompanied by specific references to admissible evidence or portions of the

record representing admissible evidence). American Airlines has offered evidence

that Nguyen's probationary period did end prior to Schaefer's arrival as manager.

Montgomery disputes that assertion but relies only on his own testimony that

Nguyen and Montgomery worked on the same midnight shift and on Brooks'

testimony that Nguyen was a probationary employee at some point between March

2005 and April 2007. (RSF Par. 68). Such evidence is not in conflict with American

Airlines' evidence that Nguyen's probationary period ended prior to Schaefer's

instillation as manager. Thus, Montgomery has not shown that Nguyen was a

similarly situated employee since the undisputed evidence demonstrates that their

probationary periods ended under different managers with differing views about the

Exam policy.

The final employee pointed to by Montgomery to support his contention that

American Airlines applied its Exam policy in a disparate fashion is Romano.

American Airlines argues that Romano is not a similarly-situated employee since

Romano had been previously terminated as part of a reduction in the work force and

then rehired, which resulted in a change in Romano's seniority date. (SF Par. 70).

American Airlines has submitted evidence that Romano was scheduled to be tested,

but that the Union intervened on behalf of Romano and successfully argued that

Romano's seniority date had passed and that he could not be tested. (SF Par. 70).

Montgomery has disputed American Airlines' statement of fact with respect to

Romano's test date. (RSF Par. 70). However, in responding to American Airlines'

statement of fact, Montgomery has not pointed to evidence that contradicts American

Airlines' contention that Romano was not tested due to a confusion with respect to

Romano's seniority date. (RSF Par. 70). American Airlines' statement of fact with

respect to Romano is, therefore, deemed to be undisputed pursuant to Local Rule

56.1. (RSF Par. 18); *see Martino*, 2008 WL 2157170, at *1 (stating that a "Court

may disregard statements and responses that do not properly cite to the record");

*Dent*, 003 WL 22025008, at *1 n.1 (indicating that a denial is improper if the denial

is not accompanied by specific references to admissible evidence or portions of the

record representing admissible evidence). Therefore, Montgomery has not properly

shown that Romano was a similarly situated employee in all material respects.

Montgomery has pointed to no other employees that are similarly situated who were

able to proceed out of their probationary period without taking the Exam. In fact, we

note that American Airlines has offered testimonial evidence that every probationary

employee in the Auto Shop since Romano has taken and passed the Exam. (SF Par.

71). Therefore, Montgomery has not satisfied the requirement of showing that

American Airlines applied its legitimate employment expectations in a disparate

manner by requiring Montgomery to take the Exam.


    b. Administration of the Exam

      Montgomery also argues that the Exam was administered in an unfair fashion

in that Montgomery was subjected to exceedingly difficult questions, that Montgomery was asked too many questions, and that Montgomery was deemed to have failed the Exam after missing only one question which Montgomery claims was based on a part number that did not exist. The parties do not dispute the basic facts that Montgomery's Exam was administered on April 24, 2007, by a supervisor who was assisted by another mechanic and that the Exam was witnessed by a union representative on behalf of Montgomery. (SF Par. 39); (RSF Par. 39).

With respect to Montgomery's allegation that the questions asked of him on his Exam were exceedingly difficult, Montgomery has not supported his contention with sufficient evidence in the record. Montgomery argues that he should have only been asked ten questions on his Exam, but was asked more. However, the undisputed record is clear that the Exam required each mechanic to demonstrate twenty-five skill sets in ten questions. (SF Par. 32); (RSF Par. 32). Montgomery relies on the testimony of the supervisor who administered his Exam for the contention that the Exam required only ten questions. (SAF Par. 90). However, that supervisor also testified that each "question" on the Exam could include "questions within a question." (Helton Dep. Par. 84-85). Montgomery states that he was asked more than the requisite number of questions since he was asked to identify numerous different parts in his equipment manual. (RSF Par. 44). However, Montgomery has not adequately supported his contention that each identification of a part in the equipment manual constituted a separate question on the Exam. There is no evidence in the record relating to the total number of questions and sub-questions that are typically asked in the Exam. In fact Montgomery has cited to his own testimony that

he was informed by a member of the Union that there could be up to 100 questions asked on the Exam. (Mont. Dep. 211). Finally, there is no evidence in the record that other employees were asked a lesser number of questions on the Exam. Thus, a reasonable factfinder could not conclude based on the evidence in the record that Montgomery was asked more questions than other employees on the Exam.

Montgomery also argues that he should have been allowed to miss more than one question on the Exam and still pass. In response, American Airlines has pointed to evidence that its policy required probationary employees to pass the Exam with a score of 100%. (SF Par. 35). Montgomery disputes this statement and relies on his own deposition testimony as well as the deposition testimony of Shay to support his claim that probationary employees were permitted to miss more than one question on the Exam. (RSF Par. 35). Montgomery testified that someone from the union told him that "you're allowed to miss so many" questions on the Exam. (Mont. Dep. 211). Such a statement, however, is hearsay in that Montgomery is relying on that alleged prior out of court statement by the union employee to assert the fact that employees were allowed to miss more than one question on the Exam, which is for the truth of the matter asserted. *See Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996)(stating that "evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay"); *see also Stinnett v. Iron Works Gym/Executive Health Spa, Inc.,* 301 F.3d 610, 613 (7th Cir. 2002)(stating that "[i]n granting summary judgment, the court may consider any evidence that would be admissible at trial" and "[t]he evidence need not be admissible in form . . . but it must be

admissible in content"). Montgomery should have presented the testimony of the actual declarant of that statement or some other employee with actual knowledge of the policy for missing questions on the Exam. Montgomery did offer the testimony of Shay who, when pressed by Montgomery's counsel, speculated that an employee may be able to miss more than one question. (Shay Dep. 32-33). However, Shay clearly indicated that he did not have personal knowledge of the Exam policies as he had never personally conducted an Exam. (Shay Dep. 33). Thus, there is no evidence in the record that would reflect that other employees besides Montgomery were permitted to miss more than one question on the Exam.

Finally, Montgomery argues that his Exam was conducted in an unfair fashion since he was asked to identify a part number that he claims did not exist. In support of his contention that the part did not exist in the manual, Montgomery relies only on his own speculation as well as the fact that none of the individuals administering the Exam identified the part he missed. (SAF Par. 16). However, such facts do not constitute evidence that the test was unfair or that the part in question did not exist in the manual. There is no evidence in the record indicating that the question was unfair, outside of Montgomery's speculation, which, as stated above, cannot form the basis for a genuine issue of material fact. Since Montgomery has not put forth sufficient evidence to refute the evidence presented by American Airlines that employees were required to obtain a score of 100% on the Exam and Montgomery has not shown at the summary judgment stage that he satisfied that requirement, no reasonable trier of fact could conclude that American Airlines administered the Exam in a disparate fashion. Montgomery has failed to point to sufficient evidence in the

record to indicate that he was meeting American Airlines' legitimate employment expectations or that other similarly situated white employees were treated more favorably. Thus, Montgomery has failed to meet his burden of establishing a *prima facie* case for discrimination.

2. Legitimate Non-Discriminatory Reason and Pretext

American Airlines argues that, even if Montgomery can establish a *prima facie* case of discrimination, American Airlines can offer a legitimate non-discriminatory reason for Montgomery's demotion from the Auto Shop, and Montgomery has not presented evidence that this explanation was a pretext for unlawful discrimination. (Mot. SJ Mem. 11-12). American Airlines has articulated legitimate and non-discriminatory explanation that Montgomery was demoted from his position in the Auto Shop based on the fact that Montgomery failed to pass the Exam. (Mot. SJ Mem. 11). American Airlines has also articulated further reasons for Montgomery's demotion including the fact that Montgomery failed a tool inspection. (SF Par. 30). Thus, the burden shifts to Montgomery to establish that these proffered explanations by American Airlines are a pretext for discrimination.

In order to show that a defendant's reason is a pretext, "'a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation.'" *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (quoting *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998)). In determining whether there is evidence of pretext, the focus of the inquiry "is whether the employer's reason is honest, not whether it is accurate or wise."

*Barricks*, 481 F.3d at 560.  Montgomery argues that he has put forth sufficient evidence to raise a genuine issue of material fact as to whether American Airlines' explanation is a pretext for unlawful discrimination.

Montgomery argues that American Airlines' explanation is a pretext for unlawful discrimination since American Airlines applied its promotional policy in an inconsistent fashion towards Montgomery.  However, as discussed above, Montgomery has not, in fact, pointed to sufficient evidence to create a genuine issue that American Airlines administered the Exam in a disparate fashion towards Montgomery.  Contrary to Montgomery's assertion, he has not pointed to other similarly situated employees that were treated more favorably than Montgomery.  Finally, in support of his pretext argument, Montgomery points to the demeanor of the supervisor who administered his Exam, which Montgomery described as "terrible."  (SAF Par. 90).  Montgomery argues that the supervisor's demeanor indicates that the supervisor harbored a discriminatory animus towards him.  However, Montgomery has not pointed to any evidence that would establish a link between the alleged demeanor of the supervisor administering the Exam and a racial animus on the part of that supervisor.  Montgomery has not alleged that the particular supervisor administering his Exam ever harassed Montgomery or made any actual display of racial bias against him.  Testimonial evidence that the supervisor administering his Exam was not cordial is not evidence that American Airlines' proffered explanation was a pretext for unlawful discrimination.  Montgomery has not disputed that all three employees administering the test including Montgomery's union representative agreed that Montgomery had not passed the Exam.  (SF Par.

46); (RSF Par. 46); (SAF Par. 96); (Rios Dep. Ex. 6).

Even taking the evidence in a light most favorable to Montgomery, Montgomery still has not pointed to sufficient evidence that shows that American Airlines' explanation for its actions were motivated by a retaliatory purpose, are unworthy of credence, or that the reason was a lie. Although Montgomery argues that the test was unfairly administered we are not here to evaluate the wisdom of American Airlines' testing policies. *See Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-11 (7th Cir. 1997)(stating that the courts "do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination" and that "[t]hus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [a court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination"). Therefore, we grant American Airlines' motion for summary judgment on Montgomery's race discrimination claims.

## CONCLUSION

Based on the foregoing, we grant American Airlines' motion for summary judgment in its entirety.


Samuel Der-Yeghiayan
United States District Court Judge

Dated:   October 21, 2008